William J. Robinson (CA Bar No. 83729)
email: wrobinson@foley.com
Jean-Paul Ciardullo (CA Bar No. 284170)
email: jciardullo@foley.com
**FOLEY & LARDNER LLP**
555 South Flower Street, Suite 3500
Los Angeles, CA 90071-2411
Telephone: 213.972.4500
Facsimile: 213.486.0065

*Attorneys for Plaintiffs*
JETPACK ENTERPRISES, LLC and
JETPACK ENTERPRISES – SAN DIEGO, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| JETPACK ENTERPRISES, LLC, a California Company, and JETPACK ENTERPRISES – SAN DIEGO, LLC., a California Company, | Case No: |
| *Plaintiffs*, | **COMPLAINT FOR BREACH OF CONTRACT, FRAUD, PROMISSORY FRAUD, NEGLIGENT MISREPRESENTATION, INTENTIONAL INTERFERENCE WITH CONTRACT, INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE, CONVERSION AND NEGLIGENCE** |
| v. | |
| JETLEV, LLC, a Delaware Company, JETLEV TECHNOLOGIES, Inc., a Florida Company, JLIP, LLC, a Delaware Company, AQUAFLIER, LLC, a Florida Company, JLSG, LLC, a New Jersey Company, SETH GERSZBERG, an Individual, and MATTHEW ROSENBLATT, an Individual, | **DEMAND FOR JURY TRIAL** |
| *Defendants*. | |

Plaintiffs Jetpack Enterprises, LLC ("Jetpack Enterprises") and Jetpack Enterprises – San Diego, LLC ("Jetpack Enterprises – San Diego"), by and through their attorneys, bring this Complaint in diversity against Defendants Jetlev, LLC; Jetlev Technologies, Inc.; JLIP, LLC; Aquaflier, LLC; JLSG, LLC; Seth Gerszberg and Matt Rosenblatt for breach of contract, fraud, promissory fraud, negligent misrepresentation, intentional interference with contract, intentional interference with prospective economic advantage, conversion and negligence.

## JURISDICTION AND VENUE

1.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the Plaintiffs and Defendants are citizens of different States and because the amount in controversy exceeds $75,000.

2.     This Court has *in personam* jurisdiction over Defendants because Defendants purposefully directed the activities complained of hereunder at Plaintiffs in California; because Defendants purposefully availed themselves of the benefits of doing business with Plaintiffs in California with respect the subject matter at issue; because the contract terms at issue were negotiated in the State of California; because Defendants' obligations were to be performed in California; and because the harms inflicted by Defendants were felt by Plaintiffs in California.   The facts supporting personal jurisdiction are laid out in further detail below and are expressly incorporated here.

3.     Venue is proper under 28 U.S.C. §1391(b)(2) and (c)(2) in the Central District of California because a substantial part of the events or omissions giving rise to the claim occurred within this District, where Jetpack Enterprises' Newport Beach central place of business operations is located.   Venue is also proper under 28 U.S.C. §1391(b)(3) because defendants are subject to the court's personal jurisdiction in this District, as discussed above.

## PARTIES

4.     Jetpack Enterprises is a California limited liability company having its principal place of business at 2600 Newport Blvd., Suite 122, Newport Beach, California

1

4828-3426-5630.1

92663.

5.    Jetpack Enterprises – San Diego is a California limited liability company having its principle place of business at 1010 Santa Clara Place, San Diego, CA 92109.

6.    Upon information and belief, Plaintiffs allege that Defendant Jetlev, LLC is a Delaware limited liability company having its principal place of business at 1105 Old Griffin Road, Dania Beach, Florida 33004.

7.    Upon information and belief, Plaintiffs allege that Defendant Jetlev Technologies, Inc. is a Florida corporation having its principal place of business at 1105 Old Griffin Road, Dania Beach, Florida 33004.

8.    Upon information and belief, Plaintiffs allege that Defendant JLIP, LLC is a Delaware limited liability company having its principal place of business at 1105 Old Griffin Road, Dania Beach, Florida 33004.

9.    Upon information and belief, Plaintiffs allege that Defendant Aquaflier, LLC is a Florida limited liability company having its principal place of business at 21200 Point Place, Suite 2903, Aventura, FL 33180.

10.    Upon information and belief, Plaintiffs allege that Defendant JLSG, LLC is a New Jersey limited liability company having its principal place of business at 811 Church Road #105, Cherry Hill, New Jersey 08002.

11.    Upon information and belief, Plaintiffs allege that Defendant Seth Gerszberg is an individual residing in the State of New York and having an address at 501 Tenth Avenue, Floor 7, New York, NY 10018.

12.    Upon information and belief, Plaintiffs allege that Defendant Matt Rosenblatt is an individual residing in the State of Florida and having an address at 21200 Point Place, Suite 2903, Aventura, FL 33180.

## FACTUAL ALLEGATIONS

### Plaintiffs' Businesses

13.    Plaintiffs are engaged in the business of renting and selling recreational water jetpack equipment under the trade name "Jetpack America."  Water jetpacks allow

2

4828-3426-5630.1

users to "fly" over a body of water by employing a floating pump to force water up a hose to an apparatus worn by the user that expels the water at high velocity, generating lift.  Water jetpacks have become increasingly popular in recent years as an alternative to other personal watercraft such as Jet Skis and Wave Runners.  Jetpack Enterprises has a jetpack rental operation in Newport Beach, and Jetpack Enterprises – San Diego has a similar operation in San Diego.  Jetpack Enterprises is also engaged in the sale of jetpacks and jetpack equipment.  Jetpack Enterprises – San Diego is a corporate affiliate of Jetpack Enterprises and has the same principal executive officer (Dean O'Malley) who is based out of Jetpack Enterprises' offices in Newport Beach, California.  Jetpack Enterprises – San Diego is an intended third party beneficiary of many of the contracts entered into by Jetpack Enterprises including some of those discussed here.

### Jetlev Technologies, Inc. And The Founding Of Jetpack Enterprises

14.    Florida Secretary of State records show that Raymond Li founded a company called Jetlev Sports, Inc. in August 2007, and that company then changed its name to Jetlev Technologies, Inc. in February 2011.  Jetlev Technologies, Inc. still nominally exists on paper today at the address 1105/1111 Old Griffin Road in Dania Beach, Florida, with Mr. Li as an executive.  However, as discussed below, corporate documents show that as of the start of 2012, Jetlev Technologies, Inc. was for all practical purposes merged with Jetlev, LLC, such that any supposed corporate separateness between those two companies from that point forward should be disregarded as illusory.

15.    Mr. Li had a strong personal passion for water jetpacks.  He considers himself the inventor of the technology, and has been awarded several patents on it (though the validity of those patents is contested).  After helping to develop the water jetpacks several years ago, Mr. Li was eager to create a new market for them.  His objective was to set up "dealerships" across the United States to sell the units at about $99,500 each.

16.    In early 2011, John Morris – the founder of Plaintiffs' businesses – entered

3

discussions with Mr. Li. Mr. Morris purchased several jetpack units (called the "R200" product) from Jetlev Technologies, Inc. for just below their $99,500 sticker price, and set up a rental operation in Newport Beach. Jetpack Enterprises, LLC was formed in May 2011 and began operating under the trade name "Jetlev Southwest" (though there was no formal operating agreement between Mr. Li's business and Jetpack Enterprises). Jetpack Enterprises owned its jetpacks outright, and ran a successful rental operation for itself. Dean O'Malley was brought on board as President of Jetpack Enterprises and to oversee day-to-day operations. Jetpack Enterprises was also promised and paid a 15% commission from Jetlev on jetpack sales that it arranged.

### Mr. Gerszberg Takes Control Of Jetlev

17. Mr. Li was an enthusiastic business partner, but upon information and belief, fell on hard times with his personal finances by the end of 2011. It was at this point that New York-based entrepreneur Seth Gerszberg took an interest in Mr. Li's company. Mr. Gerszberg is best known for founding the popular clothing company MEE Apparel, which retailed under the famous brand name "Eckō unltd." In 2009, the company reportedly had over $1 billion in global revenue and was the largest brand in streetwear. When MEE Apparel later filed for bankruptcy in 2014, Mr. Gerszberg became the bidder for millions of dollars of its assets through one of his other companies, Schuman LLC.

18. Mr. Gerszberg took a personal interest in water jetpack technology and, sometime in 2011, embarked on a course of dealing that would result in his ultimately wresting control of Raymond Li's business.

19. Mr. Gerszberg formed the entity JLSG, LLC ("JLSG") in New Jersey on November 30, 2011. Mr. Gerszberg exercises sole control over JLSG. The next day, on December 1, 2011, Mr. Gerszberg formed the twin Delaware entities Jetlev, LLC and JLIP, LLC ("JLIP") with the objective that Jetlev, LLC would replace Jetlev Technologies, Inc., and that JLIP would be the intellectual property holding company for Jetlev, LLC. Mr. Gerszberg was a manager of both companies.

20. Upon information and belief, JLSG was Mr. Gerszberg's vehicle to provide

4

his own personal funding to Jetlev, LLC and JLIP.  Mr. Gerszberg, in his individual capacity, also supplied funding to the Jetlev entities.  Mr. Gerszberg also offered to repay Mr. Li's substantial debts as a means of gaining control of Mr. Li's company.

21.   Florida Secretary of State records indicate that Jetlev, LLC and JLIP applied for a license to do business in Florida in January 2012, and that both established their headquarters at 1111 Old Griffin Road, Dania Beach, Florida, which was also Jetlev Technologies, Inc.'s address.  1111 Old Griffin Road is a commercial building adjoined by 1105 Old Griffin Road, which has more recently served as an address for Jetlev, LLC and JLIP.  JLSG signed the Florida license paperwork as each of Jetlev, LLC's and JLIP's authorized representative.

22.   Mr. Gerszberg has at all times since at least the start of 2012 been the *de facto* executive in charge of all Jetlev operations for all the Jetlev entities.  Although Raymond Li was nominally one of the managers of both Jetlev, LLC and JLIP, he ultimately had no say in the operation of the companies.  Corporate records show that at some point in the first half of 2014, Raymond Li was removed as a manager of Jetlev, LLC, leaving only Mr. Gerszberg as a manager.

23.   Jetlev Technologies, Inc. was effectively merged into Jetlev, LLC by Mr. Gerszberg.  Jetlev Technologies, Inc. transferred all of its assets to Jetlev, LLC, and Jetlev, LLC assumed effectively all of Jetlev Technologies, Inc.'s debts and obligations. No distinction was drawn between Jetlev Technologies, Inc. and Jetlev, LLC after Jetlev, LLC was created, leading those who did business with them to assume that they were one and the same company, particularly since they had the same address and phone number. The entities alternatively presented themselves to Plaintiffs as Jetlev Technologies, Inc., Jetlev, LLC, or simply as "Jetlev" without any discernable pattern.  Mr. Gerszberg treated these entities as effectively one and the same, and corporate formalities were ignored such that each company should be deemed jointly liable for the actions of the other. Jetlev Technologies, Inc. and Jetlev, LLC will collectively be referred to herein simply as "Jetlev."

4828-3426-5630.1

24.     Upon information and belief, Mr. Gerszberg co-mingled his own money with that of Jetlev and JLIP, and operated the businesses without conducting proper board meetings, keeping proper records, or setting proper policies on how money could be withdraw from the company by its executives.

25.     Mr. Gerszberg was contractually obliged to personally fund Jetlev to keep it solvent and functional, funding it either personally, or through JLSG.  JLSG is a mere fiction, existing for no other purpose than to allow the funneling of money between Mr. Gerszberg and the Jetlev entities.

26.     Sometime at the end of 2011 or the start of 2012, Mr. Gerszberg installed his brother-in-law, Benjamin White, as the new President of Jetlev.  Mr. White acted under the direct control and instruction of Mr. Gerszberg, and effectively supplanted Mr. Li.

**Jetlev Induces Jetpack Enterprises To Enter One-Sided Agreements**

27.     Jetpack Enterprises became aware of Mr. White as the new President of Jetlev, but was unaware of (and was not informed by Jetlev of) the scale of changes that had occurred.

28.     In reliance on the promise that Jetlev would be able to supply additional jetpacks, Jetpack Enterprises expanded its operations and worked to establish a branch in Hawaii and set up clients with jetpack rental operations in other countries.  This was done at significant expense and effort on Jetpack Enterprises' part.

29.     There had never been a formal operational agreement between Jetpack Enterprises and Jetlev, although in January 2013, JLIP asked Jetpack Enterprises to execute a trademark licensing agreement.  This was a one-sided agreement intended primarily to insulate Jetlev, JLIP and Mr. Gerszberg from any potential liability stemming from Jetpack Enterprises' operations.  Indeed, the agreement appears to have been drafted by Mr. Gerszberg's personal attorney, Gregg Donnenfeld, with a correspondence address in New York.  The agreement did not even convey the rights the mark "Jetlev" itself, which was already in use by Jetpack Enterprises.  Despite executing the trademark licensing agreement, almost immediately thereafter Jetpack Enterprises

6

decided to drop the "Jetlev Southwest" name in favor of the brand name "Jetpack America."  The trademark licensing agreement expired after one year.

30.    While in effect, the trademark licensing agreement called for Jetpack Enterprises to use "Headzone helmets" in conjunction with its rental operations in exchange for Jetpack Enterprises' right to use certain Jetlev branding.

31.    In February 2013, Jetpack Enterprises executed an agreement with Jetlev entitled the San Diego Flight Center Agreement ("San Diego Agreement").  The San Diego Agreement provided that Jetpack Enterprises would pay Jetlev a fully refundable $85,000 deposit toward the possible future purchase of four Jetlev R200 jetpacks for use at a new San Diego facility.  In return, Jetlev was to provide exclusivity in the San Diego region.  Jetpack Enterprises paid Jetlev $85,000 under the San Diego Agreement.

32.    In actuality, there were no other competing jetpack operations in San Diego at the time, nor would there be in the months to come.

33.    In March 2013, Jetpack Enterprises – San Diego was formed to operate the San Diego branch of Plaintiffs' rental business.  Mr. O'Malley acted as President, still based out of Newport Beach.  The companies began to refer to themselves collectively by their brand name "Jetpack America."

34.    Around this same time, Jetlev began falling behind in its business.  Over the course of 2013, it became apparent that not only was Jetlev not delivering promised equipment, it was also not following through on financial obligations.  Jetlev's conduct during 2013 included, among other things:

> a.  After Jetpack Enterprises arranged the sale of two Jetlev jetpacks to a customer in Singapore, Jetlev was many weeks late with the delivery, which reflected very poorly on Jetpack Enterprises and caused significant strife with the customer.  Indeed, the customer threatened Jetpack Enterprises with a lawsuit.  Jetpack Enterprises was owed a 15% commission on the sales, the $18,000 balance of which was never paid by Jetlev.
>
> b.  Jetlev had promised to deliver the Headzone helmets that it required under

7

the trademark licensing agreement, but then failed to deliver those helmets, forcing Plaintiffs to purchase them itself for $2,415.

c. On or about June 2013, Jetpack Enterprises accidentally wired $9,400 to Jetlev, but when Jetpack Enterprises asked for it be returned, Jetlev refused, and only relented after extensive and repeated follow up from Jetpack Enterprises.

d. Plaintiffs' Jetlev jetpack rental equipment started experiencing severe mechanical failures that included broken water pumps and c-clamp ruptures. These failures caused the jetpack equipment to be inoperable and to require significant repairs. As a result, Plaintiffs lost business. When Plaintiffs sent parts to Jetlev for repair, they were not repaired and not returned. These parts belonged to Plaintiffs and were not the property of Jetlev. Dean O'Malley ultimately was required to travel to Jetlev in Florida and ship the materials back to Jetpack Enterprises himself.

e. Jetlev was generally unresponsive to inquiries from Jetpack Enterprises, and hampered Jetpack Enterprises' ability to engage in jetpack sales by not giving Jetpack Enterprises sufficient access to information for pending customers. Jetpack Enterprises' reputation among jetpack purchasers was tarnished.

## Mr. Gerszberg Wipes The Slate Clean On The Pre-Existing Jetlev Business

35. Upon information an belief, Jetlev's decline in mid-2013 was the direct result of a deliberate effort by Mr. Gerszberg to "wipe the slate clean" on the pre-existing Jetlev business and consolidate control over the jetpack industry and jetpack intellectual property. Mr. Gerszberg had become dissatisfied with Jetlev's operations, and sought to restructure the entire jetpack industry. To accomplish this, he was content to dismantle Jetlev in favor of launching a new business at some indeterminate point in the future. Any of Jetlev's pre-existing customers and business partners that were deemed an impediment to this plan would be set aside, regardless of what obligations were owed to

8

them.  Jetlev's business partners and customers were intentionally kept in the dark about the planned restructuring so that none could raise protest as it was happening, and so that money that was owed to them could be kept by Defendants.

36.      As part of the effort to consolidate control over the jetpack industry, Jetlev, LLC filed a patent infringement lawsuit against a competitor company called Flyboard. *See* S.D. Fl. Case No. 12-61323.  Instead of selling water jetpacks, Flyboard sold water "jetboards" which resemble snowboards except that they expel water to propel the wearer.  The principal defendant in the case was a Florida company operated by Kim Robinson that acted as the US distributor for a French company owned by Frankie Zapata.  Mr. Zapata is the owner of several patents on the Flyboard design, and runs an international Flyboard distribution operation that was regarded as the primary competition for Jetlev.   Mr. Gerszberg attempted to use the lawsuit as leverage to negotiate a worldwide agreement with Mr. Zapata concerning the sale of jetpack products and licensing of jetpack intellectual property.

37.      Upon information from those with knowledge, Mr. Gerszberg sent his representatives to France to negotiate a deal with Mr. Zapata.  When this failed, Mr. Gerszberg traveled to France himself and appeared to have successfully negotiated a worldwide jetpack alliance with Mr. Zapata.  At this point, however, Mr. Zapata came into possession of Mr. Gerszberg's mobile device and discovered communications indicating that Mr. Gerszberg intended to take control of Mr. Zapata's operations.  Mr. Zapata cut off the deal, and the Flyboard lawsuit ended in a "walk-away."

38.      Around the same time as the Flyboard lawsuit came to a close, Jetlev announced that it would soon be releasing a new product called the "Aquaboard" which was essentially equivalent in design to Mr. Zapata's patented Flyboard.   Jetlev also indicated that it planned to release an improved jetpack product called the "Aquaflyer" to replace the pre-existing Jetlev R200 units.  On or about August 2013, Jetlev posted photos on their website of the supposed Aquaboard and Aquaflyer units, stating that they would be available by November 2013, and encouraging people to make deposits.

4828-3426-5630.1

However, the Aquaboard and Aquaflyer were not actually in production, and it was later revealed that the photographs were shot using components from Mr. Zapata's Flyboard equipment.

39.     Jetlev also sought to gain control over Shanghai-based Stratospheric Industries, Inc., which had launched a highly successful jetpack product called the X-Jetpack for a tenth the cost of the Jetlev R200.   Mr. Gerszberg demanded that Stratospheric hand over all of its technical and supply channel information to Jetlev, and effectively cut themselves out of the industry.   Stratospheric did not comply, but did agree to supply one of its X-Jetpacks to Jetlev pursuant to a Non-Disclosure Agreement on the promise that Jetlev would provide feedback to Stratospheric.   Instead, Jetlev, at the direction of Mr. Gerszberg and his close associates, dismantled and attempted to reverse engineer the X-Jetpack in violation of the Non-Disclosure Agreement and after Stratospheric had demanded the unit's return.

40.     Upon information and belief, as part of his effort to "wipe the slate clean" on the pre-existing Jetlev operations, Mr. Gerszberg allowed Jetlev's business to fail and to be underfunded until Mr. Li was financially unable to remain involved and was forced to abdicate his little remaining interest in the companies.   US Patent Office records indicate that in September 2013, Mr. Li sold all of his jetpack patents to JLIP, placing them under Mr. Gerszberg's direct control.

41.     In mid-2013, as part of his effort to cut the losses of the pre-existing Jetlev business, Mr. Gerszberg installed his close friend and confidante Matt Rosenblatt as the newly-named "CEO" of Jetlev, effectively removing his brother-in-law Benjamin White in the process.   Any effort that Mr. White may have made to carry on the pre-existing business of Jetlev was undone by Mr. Rosenblatt, who proceeded to fire most of the small remaining staff of Jetlev, rendering it completely incapable of doing business.   Mr. Rosenblatt assumed the role of the face of Jetlev to its business partners and new customers.

10

### Jetlev Induces Plaintiffs To Credit Money Owed
### Towards Jetpacks That Will Never Be Delivered

42.     Jetpack Enterprises was not made aware of what was transpiring, and was instead induced to continue expanding its operations on the promise that Jetlev would be able to supply new jetpacks (the promised Aquaflyer and Aquaboard units).  In reliance on these false assurances, Plaintiffs expended time and money to promote Jetlev jetpacks and seek commission-generating customers, many of whom made deposits with Jetpack Enterprises in the anticipation of purchasing new jetpacks.  Jetpack Enterprises was thus putting its reputation on the line for Jetlev.

43.     Starting in July 2013, Mr. O'Malley engaged in a series of negotiations and discussions with Mr. Rosenblatt to try to get business back on course.  In reliance on the promise that Jetlev would imminently be releasing the Aquaflyer and Aquaboard on or about November 2013, Jetpack Enterprises put energy and effort into salvaging the relationship with Jetlev and promoting Jetlev products.  On or about August 2013, Jetpack Enterprises informed Jetlev that it wanted a refund of the $85,000 deposit it had made on the older model R200 units pursuant to the San Diego Agreement.  Jetpack Enterprises also requested payment of the long overdue $18,000 in commission payments on the Singapore sales, as well as compensation for the $2,415 that Jetpack Enterprises had paid to obtain new Headzone helmets.

44.     Mr. Rosenblatt led Mr. O'Malley to believe that Jetlev was merely facing a short term cash crunch, and that the best course of action was simply to credit the money that was owed to Jetpack Enterprises toward the purchase of new Aquaflyer and Aquaboard products, which would start being delivered on or about November 2013. However, upon information and belief, the units were not in production, and Mr. Rosenblatt was merely trying to mollify Jetpack Enterprises long enough for Jetlev to be dismantled, and so that Defendants could keep Jetpack Enterprises' money.

45.     The terms of the proposed agreement were hashed out over numerous email exchanges and phone calls with Mr. O'Malley in California.  Mr. O'Malley drew up a

11

**COMPLAINT**

short contract ("Contract") memorializing the deal, and on November 7, 2013, travelled to meet Mr. Rosenblatt and obtain his signature.  That Contract is attached hereto as **Exhibit A**.  Mr. O'Malley signed the Contract on behalf of Jetpack America, referring to the brand of both his companies.  In the Contract, Jetlev acknowledges and admits that it owed $105,422.80.  In exchange for the forgiveness of that debt, Mr. O'Malley agreed to accept delivery of 11 AquaFlyer units valued at $7,000 each, and 3 Aquaboard units valued at $6,300 each.  Mr. Rosenblatt signed the Contract on behalf of "Jetlev" as "President & CEO."  Attached to the Contract is a "Credit Memo" showing a $77,000 credit towards the purchase of the 11 AquaFlyers, and $18,900 towards the purchase of the 3 Aquaboards.  A separate spreadsheet entitled "Jetlev/Jetpack America Running Balance" is also attached, summarizing the bases of the debts owed.  The understanding between the parties was that the units would start being delivered before the end of 2013, and the Contract requires Jetlev to provide parts and services at 50% off until the final unit had been delivered "to ensure timely delivery."

46.     Jetlev never delivered any of the Aquaflyers or Aquaboards, and has not returned any of the money that was owed.  Upon information and belief, no Aquaflyers or Aquaboards have ever actually been produced.

47.     In March 2014, Mr. Rosenblatt formed a new company called Aquaflier, LLC ("Aquaflier") in Florida.  Upon information and belief, Mr. Gerszberg and Mr. Rosenblatt created this entity with the expectation that it would pick up business at some indeterminate point in the future without having to answer to Jetlev's pre-existing obligations.  Their intention was to shift any remaining assets of Jetlev to Aquaflier so that Aquaflier could hit the ground running once it had a viable commercial product.

### Jetlev Falsely Claims To Have Gone Bankrupt
### To Induce Plaintiffs To Give Up Their Claim

48.     Mr. Rosenblatt continued to lead Mr. O'Malley to believe that the promised jetpacks were merely delayed, and that Jetlev they would still be delivering them imminently.  In fact, Mr. Rosenblatt knew that the units were not going to be available,

12

4828-3426-5630.1

and indeed that they were not even being produced.

49.     Finally, in April 2014, after months of frustration and dealing with prospective customers who had made deposits for the new jetpacks, Mr. O'Malley travelled to Jetlev headquarters to check on the status of the promised units.   Mr. Rosenblatt did not come to the Jetlev office when Mr. O'Malley arrived, and Mr. O'Malley was instead forced to track him to a local motorsports store where Mr. Rosenblatt was known to go to evade upset customers.   Mr. Rosenblatt informed Mr. O'Malley that he was in the midst of bankrupting Jetlev with plans to launch the new jetpack systems under a new company.   Mr. Rosenblatt stated that, since the Contract was signed by him as a representative of Jetlev, which was now bankrupt, Jetlev would not be honoring the terms of the Contract, and Jetpack Enterprises would not be repaid any of its money.   Mr. Rosenblatt then offered to allow Mr. O'Malley to buy new units from his new company for a similar price that was negotiated in the Contract.   Defendants' new company, however, was nowhere close to being able to deliver new products, and in fact has never launched the Aquaboard and Aquaflyer units.

50.     Based on Mr. Rosenblatt's assertion that Jetlev was now bankrupt, Plaintiffs cut ties with Jetlev, and Jetlev similarly ceased communications with Plaintiffs.   As far as Plaintiffs were made to believe, the relationship was over and their money had been lost. Jetpack Enterprises was forced to return the deposits from customers who wanted to purchase the Aquaboard and Aquaflyer, which was damaging to Plaintiffs' reputation. Plaintiffs had been counting on the new Jetlev units to supplement their existing business, and had invested considerable time, money and effort in reliance on Jetlev's assurances. Jetpack Enterprises lost profits on the sales it would have made on the new units.

51.     Relying on Mr. Rosenblatt's statement that Jetlev had gone bankrupt and would not be refunding the money that was owed, Plaintiffs were induced to abandon the Contract and assume that the money was lost.   However, unbeknownst to Plaintiffs, Jetlev never went bankrupt.   In fact, Jetlev continues to offer jetpack equipment for sale (see www.jetlev.com), taking deposits on equipment that has yet to be delivered.

Plaintiffs did not discover that Jetlev had not gone bankrupt until just recently.

52.     Many other former Jetlev distributors, customers and business partners were similarly defrauded by Jetlev.  These third parties paid Jetlev tens of thousands of dollars for new jetpack units before Jetlev announced that it had gone "bankrupt" and would not be refunding any of their money.  Several lawsuits have been filed against Jetlev, but Mr. Gerszberg and Mr. Rosenblatt have been content to allow default judgments to accrue against Jetlev, apparently assuming that no plaintiff would have the sophistication to determine a way to collect.  Mr. Rosenblatt was sued in his personal capacity, but, upon information and belief, has attempted to evade service of process.  All the while, Mr. Gerszberg and Mr. Rosenblatt have refused to file for bankruptcy and open up Jetlev's books to public and judicial scrutiny.

53.     In early 2014, believing Jetlev to have gone out of business, Plaintiffs established a relationship with Stratospheric Industries.  On August 6, 2014, without any warning, JLIP sued Plaintiffs and Stratospheric for patent infringement.  *See* S.D. Fl. Case No. 14-61798.

### Mr. Gerszberg And Mr. Rosenblatt Are Liable As Alter Egos

54.     Mr. Gerszberg and Mr. Rosenblatt have hidden behind the corporate veil of Jetlev to engage in the foregoing actions for their own personal gain.  Upon information and belief, both Mr. Gerszberg and Mr. Rosenblatt co-mingled their personal assets with Jetlev's assets at their convenience, and then raided all the assets of Jetlev when they dismantled the company.  Mr. Gerszberg has alternately mingled his own funds with Jetlev, and used JLSG, under his sole direction, to funnel cash between him and Jetlev. Mr. Gerszberg and Mr. Rosenblatt have not observed corporate formalities, did not keep adequate books or records, deliberately allowed Jetlev to be underfunded and understaffed such that it could not properly function or honor obligations, did not proceed with any proper bankruptcy procedures, used the dismantling of Jetlev as leverage to wrest control of the jetpack intellectual property for themselves, used the dismantling of Jetlev to avoid paying debts, and otherwise ignored any separateness between their own

affairs and those of Jetlev (except when it suited them).

55.     Mr. Gerszberg and Mr. Rosenblatt are thus properly considered the alter egos of Jetlev, and therefore jointly liable with Jetlev.  Adherence to the notion of a separateness between Jetlev on one hand, and Mr. Gerszberg and Mr. Rosenblatt on the other, would sanction fraud and promote injustice.

56.     To the extent Mr. Gerszberg has used JLSG as a corporate shield to engage in the foregoing acts, JLSG is also liable and its corporate veil may be pierced to reach Mr. Gerszberg.

**JLIP, JLSG And Aquaflier Have Successor And/Or Alter Ego Liability**

57.     To the extent that Jetlev has effectively ceased to exist and is unable to account for its liabilities, JLIP, Aquaflier, and JLSG should each be held jointly liable for Jetlev's misconduct under a successor liability and/or alter ego theory.  Each of JLIP, Aquaflier, and JLSG have assumed the assets of Jetlev, have the same employees and managers as Jetlev, and have failed to observe proper corporate formalities in isolating their businesses from Jetlev, or properly disposing of Jetlev's outstanding obligations to creditors.

**CLAIM I – BREACH OF CONTRACT**

58.     Plaintiffs hereby incorporate paragraphs 1-57 as if stated fully herein.

59.     This is a claim by Plaintiffs against Jetlev for breach of contract.

60.     The Contract represented a binding agreement by which Jetlev was to have provided Plaintiffs with $95,900 worth of equipment in exchange for forgiveness of Jetlev's $105,422.80 debt to Plaintiffs.

61.     Plaintiffs fully performed their obligations under the Contract by forebearing from collecting the $105,422.80 of their funds and allowing said funds to be credited toward the purchase of the promised new jetpacks.

62.     Jetlev completely failed to deliver any of the promised equipment and has not otherwise repaid Plaintiffs on amounts that were owed.  Instead, Jetlev falsely claimed to have gone bankrupt to avoid performance.  Jetlev has thus materially breached

the Contract to such an extent that the breach amounts to a total failure of consideration.

63.     Plaintiffs' damages because of said breach are $105,422.80 (plus interest), in addition to costs associated with time, money and effort expended in reliance on Jetlev's promise to provide new equipment, and lost profits when that equipment was not delivered.  Plaintiffs also suffered reputational injury.

64.     Plaintiffs are also and/or in the alternative entitled to rescission, restitution and compensatory damages to make them whole.

65.     Mr. Gerszberg and Mr. Rosenblatt are the alter egos of Jetlev, and are thus jointly liable on this claim.

66.     To the extent that Jetlev is defunct and unable to account for its liabilities, JLIP, Aquaflier and JLSG are jointly liable on this claim as the successors in interest to Jetlev, and/or as Jetlev's alter egos.

## CLAIM II - FRAUD

67.     Plaintiffs hereby re-allege Paragraphs 1-57 as if stated fully herein.

68.     This is a claim by Plaintiffs for fraud against Jetlev, as well as against Mr. Gerszberg and Mr. Rosenblatt, and each of them, in their personal capacities.

69.     Jetlev, under the direction of Mr. Gerszberg and Mr. Rosenblatt, led Plaintiffs to believe that Jetlev would continue to support Plaintiffs' businesses with new jetpacks.  This was a material misrepresentation, however.  Jetlev's actual goal was to placate Plaintiffs long enough for Jetlev's pre-existing business to be dismantled.  Jetlev was aware that Plaintiffs were investing time and money in reliance on Jetlev's assurances, but were content to allow Plaintiffs to continue to do so to prevent Plaintiffs' suspicions from being raised, and so that Jetlev could keep Jetpack Enterprises' money.

70.     Jetlev knew at the time it entered into the Contract that it would not be able to deliver the promised equipment, but used the Contract as a ruse and intentional misrepresentation to mollify Plaintiffs and avoid paying the $105,422.80 that was owed.

71.     In forebearing from collecting the $105,422.80, Plaintiffs justifiably relied upon Jetlev's material misrepresentation that the money would be credited toward the

purchase of new equipment that would be delivered within the next several weeks.

72.   As a direct and proximate cause of the misconduct herein alleged, Plaintiffs suffered damages of $105,422.80 (plus interest), in addition to costs associated with time, money and effort expended in reliance on Jetlev's promise to provide new equipment, and lost profits when that equipment was not delivered.   Plaintiffs also suffered reputational injury.

73.   Later, Jetlev engaged in a second fraud by inventing the fiction, and making the intentional and material misrepresentation, that it was going into bankruptcy and that all of its obligations to Plaintiffs – including those under the Contract – were discharged.

74.   In fact, Jetlev never went into bankruptcy, and Jetlev's intention was to convince Plaintiffs to abandon their claims and the money that was owed.

75.   Plaintiffs justifiably relied upon Jetlev's material misrepresentations that it had gone bankrupt, and consequently suffered damages when it was induced to give up its claim to the $105,422.80 that was owed.

76.   As a direct and proximate cause of the misconduct herein alleged, Plaintiffs suffered damages of $105,422.80 (plus interest), in addition to costs associated with time, money and effort expended in reliance on Jetlev's promise to provide new equipment, and lost profits when that equipment was not delivered.   Plaintiffs also suffered reputational injury.

77.   Mr. Gerszberg's and Mr. Rosenblatt's conduct reflects a callous disregard for Jetlev's business partners and customers, as well as a disregard for corporate formalities and obligations.  In doing the acts hereinabove alleged, Jetlev, Mr. Gerszberg and Mr. Rosenblatt acted fraudulently, oppressively, and maliciously and, by reason thereof, Plaintiffs are entitled to exemplary and punitive damages.

78.   Mr. Gerszberg and Mr. Rosenblatt are liable for their own acts of fraud, and are also jointly liable for any fraud by Jetlev because they are Jetlev's alter egos.

79.   To the extent that Jetlev is defunct and unable to account for its liabilities, JLIP, Aquaflier and JLSG should be held jointly liable for any acts of fraud by Jetlev

1   because they are the successors in interest to Jetlev, and/or Jetlev's alter egos.

2   ### CLAIM III – PROMISSORY FRAUD

3   80.     Plaintiffs hereby re-allege Paragraphs 1-57 as if stated fully herein.

4   81.     This is a claim by Plaintiffs for promissory fraud against Jetlev, as well as

5   against Mr. Gerszberg and Mr. Rosenblatt, and each of them, in their personal capacities.

6   82.     Jetlev, under the direction of Mr. Gerszberg and Mr. Rosenblatt, promised

7   and led Plaintiffs to believe that Jetlev would continue to support Plaintiffs' businesses

8   with new jetpacks.  Jetlev's goal, however, was to placate Plaintiffs long enough for

9   Jetlev's pre-existing business to be dismantled.  Jetlev was aware that Plaintiffs were

10  investing time and money in reliance on Jetlev's assurances, but were content to allow

11  Plaintiffs to continue to do so to prevent Plaintiffs' suspicions from being raised, and so

12  that Jetlev could keep Jetpack Enterprises' money.

13  83.     Jetlev knew at the time it made such promises and entered into the Contract

14  that it would not be able to deliver the promised equipment, but used the Contract as a

15  ruse to mollify Plaintiffs and avoid paying the $105,422.80 that was owed.

16  84.     In forebearing from collecting the $105,422.80, Plaintiffs justifiably relied

17  upon Jetlev's promises that their business would be supported and that the money would

18  be credited toward the purchase of new equipment that would be delivered within the

19  next several weeks.

20  85.     Defendants' promises were fraudulent.  As a direct and proximate cause of

21  the fraud herein alleged, Plaintiffs suffered damages of $105,422.80 (plus interest), in

22  addition to costs associated with time, money and effort expended in reliance on Jetlev's

23  promise to provide new equipment, and lost profits when that equipment was not

24  delivered.  Plaintiffs also suffered reputational injury.

25  86.     Mr. Gerszberg's and Mr. Rosenblatt's conduct reflects a callous disregard

26  for Jetlev's business partners and customers, as well as a disregard for corporate

27  formalities and obligations.  In doing the acts hereinabove alleged, Jetlev, Mr. Gerszberg

28  and Mr. Rosenblatt acted fraudulently, oppressively, and maliciously and, by reason

18

4828-3426-5630.1

thereof, Plaintiffs are entitled to exemplary and punitive damages.

87.    Mr. Gerszberg and Mr. Rosenblatt are liable for their own acts of fraud, and are also jointly liable for any fraud by Jetlev because they are Jetlev's alter egos.

88.    To the extent that Jetlev is defunct and unable to account for its liabilities, JLIP, Aquaflier and JLSG should be held jointly liable for any acts of fraud by Jetlev because they are the successors in interest to Jetlev, and/or Jetlev's alter egos.

### CLAIM IV – NEGLIGENT MISREPRESENTATION

89.    Plaintiffs hereby incorporate paragraphs 1-57 as if stated fully herein.

90.    This is a claim by Plaintiffs for negligent misrepresentation against Jetlev, as well as against Mr. Gerszberg and Mr. Rosenblatt, and each of them, in their personal capacities.

91.    At a minimum, Jetlev, under the direction of Mr. Gerszberg and Mr. Rosenblatt, negligently represented to Plaintiffs that Jetlev would continue to do business and be able to sell Plaintiffs new jetpacks.  Jetlev knew or should have known that its business was on the verge of effectively shutting down, but was content to keep Jetpack Enterprises' money on the promise that Jetlev was merely experiencing a short term cash crunch and that new jetpack units would be delivered soon.  As such, Defendants' representations were made negligently.

92.    In justifiable reliance on Jetlev's negligent representations, Plaintiffs suspended pursuit of the money that was properly owed to them, and continued to invest time, money and advertising toward the promised launch of the new Jetlev jetpacks.

93.    As a direct and proximate cause of the misconduct herein alleged, Plaintiffs suffered damages of $105,422.80 (plus interest), in addition to costs associated with time, money and effort expended in reliance on Jetlev's promise to provide new equipment, and lost profits when that equipment was not delivered.  Plaintiffs also suffered reputational injury.

94.    Mr. Gerszberg's and Mr. Rosenblatt's conduct reflects a callous disregard for Jetlev's business partners and customers, as well as a disregard for corporate

formalities and obligations.  In doing the acts hereinabove alleged, Jetlev, Mr. Gerszberg and Mr. Rosenblatt acted with extreme negligence and, by reason thereof, Plaintiffs are entitled to exemplary and punitive damages.

95.    Mr. Gerszberg and Mr. Rosenblatt are liable for their own acts of negligent misrepresentation, and are also jointly liable for any negligent misrepresentations by Jetlev because they are Jetlev's alter egos.

96.    To the extent that Jetlev is defunct and unable to account for its liabilities, JLIP, Aquaflier and JLSG should be held jointly liable for any acts of negligent misrepresentation by Jetlev because they are the successors in interest to Jetlev, and/or Jetlev's alter egos.

### CLAIM V – INTENTIONAL INTERFERENCE WITH CONTRACT

97.    Plaintiffs hereby incorporate paragraphs 1-57 as if stated fully herein.

98.    This is a claim by Plaintiffs against Mr. Gerszberg and Mr. Rosenblatt, and each of them, for intentional interference with contract.

99.    The Contract represented a binding agreement by which Jetlev was to have provided Plaintiffs with $95,900 worth of equipment in exchange for forgiveness of Jetlev's $105,422.80 debt to Plaintiffs.

100.    Plaintiffs fully performed their obligations under the Contract by forebearing from collecting the $105,422.80 of their funds and allowing said funds to be credited toward the purchase of the promised new jetpacks.

101.    Mr. Gerszberg and Mr. Rosenblatt had knowledge of Jetlev's Contract with Plaintiffs.

102.    Mr. Gerszberg and Mr. Rosenblatt deliberately interfered with the Contract by various acts, including causing Jetlev to renege on its promise to deliver equipment by deliberately failing to devote proper resources to the task, and indeed by not even undertaking the task.  Mr. Gerszberg and Mr. Rosenblatt took these actions not in the capacity of managers of Jetlev but for their own personal gain so that they could wipe the Jetlev slate clean and move on unencumbered with a new business enterprise.  The result

was that Jetlev completely failed to deliver any of the promised equipment and has not otherwise repaid Plaintiffs on amounts that were owed.

103.     As a direct and proximate cause of the misconduct herein alleged, Plaintiffs suffered damages of $105,422.80 (plus interest), in addition to costs associated with time, money and effort expended in reliance on Jetlev's promise to provide new equipment, and lost profits when that equipment was not delivered.   Plaintiffs also suffered reputational injury.

104.     Mr. Gerszberg's and Mr. Rosenblatt's conduct reflects a callous disregard for Jetlev's business partners and customers, as well as a disregard for corporate formalities and obligations.   In doing the acts hereinabove alleged, Mr. Gerszberg and Mr. Rosenblatt acted fraudulently, oppressively, and maliciously and, by reason thereof, Plaintiffs are entitled to exemplary and punitive damages.

## CLAIM VI – INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

105.     Plaintiffs hereby incorporate paragraphs 1-57 as if stated fully herein.

106.     This is a claim by Jetpack Enterprises against Jetlev, JLIP, JLSG, Mr. Gerszberg and Mr. Rosenblatt, and each of them, for intentional interference with prospective economic advantage.

107.     In 2011, Jetpack Enterprises had a positive relationship with Mr. Li's Jetlev Technologies, Inc. business.   This relationship allowed Jetpack Enterprises to purchase jetpack equipment from Mr. Li's business, and allowed Jetpack Enterprises to pursue commissioned jetpack sales.   Jetpack Enterprises' relationship with Mr. Li's Jetlev Technologies, Inc. business had the potential for a bright future, and thus constituted a valuable prospective economic advantage.

108.     Defendants were aware that Jetpack Enterprises had this prospective economic advantage with Mr. Li's Jetlev Technologies, Inc., yet deliberately set out to wipe the slate clean on that relationship for their own personal gain in the hope of remolding the jetpack industry.

21

109.     Such acts of interference included at least the following.  Defendants used Jetlev, LLC to take over Mr. Li's pre-existing business.  Instead of honoring the existing relationship with Jetpack Enterprises, Defendants allowed Jetlev to fall behind on its obligations to Jetpack Enterprises.  Defendants then induced Jetpack Enterprises to sign agreements that were either one-sided or fraudulent.  Mr. Gerszberg's JLIP then sued Jetpack Enterprises for patent infringement when Jetpack Enterprises found a new business partner.

110.     As a direct and proximate cause of the Defendants' intentional interference with the original Jetpack Enterprises – Jetlev Technologies, Inc. relationship, Jetpack Enterprises lost a jetpack supplier, lost the possibility of commissioned sales, suffered reputational harm, and lost $105,422.80 along with other money expended in reliance on false promises.

111.     Mr. Gerszberg's and Mr. Rosenblatt's conduct reflects a callous disregard for Jetlev's business partners and customers, as well as a disregard for corporate formalities and obligations.  In doing the acts hereinabove alleged, Defendants acted fraudulently, oppressively, and maliciously and, by reason thereof, Plaintiffs are entitled to exemplary and punitive damages.

### CLAIM VII – CONVERSION

112.     Plaintiffs hereby incorporate paragraphs 1-57 as if stated fully herein.

113.     This is a claim by Plaintiffs for conversion against Jetlev, as well as against Mr. Gerszberg and Mr. Rosenblatt, and each of them, in their personal capacities.

114.     Jetlev, under the direction of Mr. Gerszberg and Mr. Rosenblatt, wrongfully exercised dominion over Jetpack Enterprises' property – namely, Jetpack Enterprises' money, which is a fixed and readily identifiable sum – by taking that property and applying it to the personal use of the Defendants.

115.     As a direct and proximate cause of the misconduct herein alleged, Plaintiffs suffered damages of $105,422.80 (plus interest), in addition to costs associated with time, money and effort expended in reliance on Jetlev's promise to provide new equipment,

22

**COMPLAINT**

and lost profits when that equipment was not delivered.   Plaintiffs also suffered reputational injury.

116.    Mr. Gerszberg's and Mr. Rosenblatt's conduct reflects a callous disregard for Jetlev's business partners and customers, as well as a disregard for corporate formalities and obligations.  In doing the acts hereinabove alleged, Jetlev, Mr. Gerszberg and Mr. Rosenblatt acted fraudulently, oppressively, and maliciously and, by reason thereof, Plaintiffs are entitled to exemplary and punitive damages.

117.    Mr. Gerszberg and Mr. Rosenblatt are liable for Jetlev's acts of conversion by virtue of their direct involvement in the acts, and are also jointly liable for any conversion by Jetlev because they are Jetlev's alter egos.

118.    To the extent that Jetlev is defunct and unable to account for its liabilities, JLIP, Aquaflier and JLSG should be held jointly liable for any acts of conversion by Jetlev because they are the successors in interest to Jetlev, and/or Jetlev's alter egos.

## CLAIM VIII – NEGLIGENCE

119.    Plaintiffs hereby incorporate paragraphs 1-57 as if stated fully herein.

120.    This is a claim by Plaintiffs for negligence against Jetlev, as well as against Mr. Gerszberg and Mr. Rosenblatt, and each of them, in their personal capacities.

121.    At a minimum, Jetlev, under the direction of Mr. Gerszberg and Mr. Rosenblatt, acted negligently in the management of Jetpack Enterprises' money.  Jetlev, Mr. Gerszberg and Mr. Rosenblatt had a duty to properly apply Jetpack Enterprises' money toward the purchase of equipment, and breached that duty by mismanaging Jetpack Enterprises' funds and not making any provision for their repayment.

122.    Jetlev's breach – and the corresponding breach of Mr. Gerszberg and Mr. Rosenblatt – directly and proximately caused Plaintiffs to lose the $105,422.80 that had been entrusted to Jetlev, as well as to not receive any of the promised equipment.

123.    As a direct and proximate cause of the misconduct herein alleged, Plaintiffs suffered damages of $105,422.80 (plus interest), in addition to costs associated with time, money and effort expended in reliance on Jetlev's promise to provide new equipment,

**COMPLAINT**

and lost profits when that equipment was not delivered.   Plaintiffs also suffered reputational injury.

124.   Mr. Gerszberg's and Mr. Rosenblatt's conduct reflects a callous disregard for Jetlev's business partners and customers, as well as a disregard for corporate formalities and obligations.  In doing the acts hereinabove alleged, Jetlev, Mr. Gerszberg and Mr. Rosenblatt acted with extreme negligence and, by reason thereof, Plaintiffs are entitled to exemplary and punitive damages.

125.   Mr. Gerszberg and Mr. Rosenblatt are liable for Jetlev's negligence by virtue of their direct involvement in the acts, and are also jointly liable for any negligence by Jetlev because they are Jetlev's alter egos.

126.   To the extent that Jetlev is defunct and unable to account for its liabilities, JLIP, Aquaflier and JLSG should be held jointly liable for any acts of negligence by Jetlev because they are the successors in interest to Jetlev, and/or Jetlev's alter egos.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs seeks:

a) judgment that Jetlev materially breached the Contract, and that the other Defendants are jointly liable with Jetlev on Plaintiffs' claims;

b) judgment that Defendants are liable for fraud, promissory fraud, conversion, and intentional interference with prospective business advantage, or in the alternative, for negligent misrepresentation, negligence and/or intentional interference with contract;

c) rescission of the Contract and full restitution of monies owed to Plaintiffs, which is at least $105,422.80, plus interest;

d) compensatory damages in an amount sufficient to make Plaintiffs whole;

e) punitive damages in an amount commensurate with Defendants' misconduct and to dissuade further misconduct, but in no event less than $1,000,000.00;

f) an award of Plaintiffs' attorneys fees and costs in this action;

**COMPLAINT**

g) pre- and post-judgment interest; and

h) such other and further relief as the Court may deem just and equitable.

Dated: December 5, 2014

**FOLEY & LARDNER LLP**

By: _/s/ Jean-Paul Ciardullo_
       Jean-Paul Ciardullo

*Attorneys for Plaintiffs*
Jetpack Enterprises, LCC and
Jetpack Enterprises – San Diego, LLC

25

**COMPLAINT**

## **DEMAND FOR JURY TRIAL**

Jetpack Enterprises, LCC and Jetpack Enterprises – San Diego, LLC hereby demand a trial by jury of all issues triable by a jury.

Dated: December 5, 2014

**FOLEY & LARDNER LLP**

By: */s/ Jean-Paul Ciardullo*
      Jean-Paul Ciardullo

*Attorneys for Plaintiffs*
Jetpack Enterprises, LCC and
Jetpack Enterprises – San Diego, LLC

26

4828-3426-5630.1